# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

YOUNG MIN BAN, )
)
)
Plaintiff, )
)
v. )  C.A. No. 2022-0768-JTL
)
JOSEPH P. MANHEIM and WEST )
36th, INC., )
)
Defendants. )

## POST TRIAL OPINION

Date Submitted: May 6, 2025
Date Decided: May 19, 2025

Jeffrey S. Cianciulli, WEIR GREENBLATT PIERCE LLP, Wilmington, DE; *Attorney for Plaintiff.*

Bruce E. Jameson, John C. Day, Seth T. Ford, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, DE; Joshua K. Bromberg, KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

Delaware Valley Regional Center, LLC ("DVRC") managed investment funds that offered foreign nationals the ability to qualify for U.S. residency under the EB-5 Immigrant Investor Program. To participate, a foreign national contributed $500,000 in capital plus $50,000 in syndication fees to DVRC. Because the foreign nationals treated the $550,000 as the price for getting permanent U.S. residency, they were comparatively insensitive to the fees and investment returns associated with their investment. DVRC charged a 2% annual management fee and took 75% of the profits. Compared to a lucrative 2-and-20 compensation structure, 2-and-75 is Croesian.[1]

West 36th, Inc. ("WestCo") held a 10% member interest in DVRC. Defendant Joseph A. Manheim controlled WestCo through his ownership of 70% of its stock. Plaintiff Young Min Ban owned 15% of WestCo's stock. A non-party held the remaining 15%.

WestCo served as DVRC's sole manager. Through his control over WestCo, Manheim controlled DVRC.

Penfold, L.P. owned the remaining 90% member interest in DVRC. Penfold was a passive non-managing member with no authority over the business or affairs of DVRC.

Penfold had three limited partners: Manheim, Ban, and a different non-party. Each limited partner held a one-third partnership interest. Reath & Co., LLC

---

[1] As in "as rich as Croesus." *See https://www.worldhistory.org/croesus/*. Given its absence from the Oxford English Dictionary, the adjective may be a neologism. But it's apt.

("ReathCo") served as Penfold's general partner. Manheim controlled ReathCo. Through it, he had the exclusive authority to act on Penfold's behalf.

Manheim took substantial sums from DVRC to fund a lavish lifestyle. Anticipating disputes with Ban and the other investor, Manheim adopted a new limited liability company agreement for DVRC that empowered WestCo to determine in its sole and absolute discretion that the continued involvement of a member could cause DVRC to suffer a "Material Adverse Effect." After making that determination, WestCo could cause DVRC to redeem the member's interest for the lesser of its appraised value or the amount of the member's capital account (the "DVRC Redemption Right").

In 2022, Manheim caused WestCo to exercise the DVRC Redemption Right and eliminate Penfold's ownership interest. Manheim caused DVRC to pay book value using a figure that Manheim calculated himself. Manheim produced no support for his calculation.

Manheim exercised the DVRC Redemption Right based on the threat of a Material Adverse Effect allegedly posed by the non-party investor. Ban did not pose a similar threat. WestCo caused DVRC to issue replacement equity to Manheim and could have done the same for Ban, but Manheim did not consider that idea. He wanted to eliminate Ban's interest at an arbitrarily low price.

To eliminate Ban from WestCo, Manheim unilaterally adopted a bylaw that purported to empower holders of a majority of WestCo's shares to require any other stockholder to sell its shares to the majority (the "WestCo Call Right"). Manheim

invoked the WestCo Call Right to acquire Ban's 15% interest in WestCo. Although the WestCo Call Right required the payment of fair value, Manheim arbitrarily set the value at $100 per share.

In this litigation, Ban seeks damages for the loss of his ownership interests. Ban proved that Manheim's exercise of the DVRC Redemption Right was a self-interested act. Manheim failed to prove that the redemption was fair.

Manheim's use of the WestCo Call Right was worse. The Delaware General Corporation Law ("DGCL") does not allow a bylaw to impose a transfer restriction on already-issued shares without the affected stockholder's assent. Ban never assented. Manheim's attempted use of the WestCo Call Right was therefore statutorily invalid. Plus it was a self-interested act subject to the entire fairness test. Manheim failed to prove that the call exercise was fair.

This decision awards Ban damages of $6,898,612, plus pre- and post-judgment interest, minus any cash distribution Ban already received.

## I.    FACTUAL BACKGROUND

The facts are drawn from two sources. The parties previously litigated a related action to final judgment,[2] and the court's factual findings in that action are binding. For new factual issues, the court has drawn on the record generated during

---

[2] *Bamford v. Penfold, L.P.*, 2022 WL 2278867 (Del. Ch. Jun. 24, 2022), *aff'd sub nom Manheim v. Ban*, 319 A.3d 268 (Del. 2024) (TABLE).

3

a three-day trial where three fact witnesses and three experts testified live. The parties also introduced 369 exhibits and lodged eight deposition transcripts.[3]

As in the previous litigation, the record presents a fact finder with many challenges. The entities at issue are small and closely held. The parties have a history of creating documents to further their desired goals (mainly tax minimization) rather than to reflect what took place. The principal witnesses—Manheim and Ban—were directly interested in the outcome and had their credibility impeached successfully both in this case and in the prior litigation.

The court has assessed the credibility of the witnesses and weighed the evidence as a whole. What follows comprise the court's factual findings by a preponderance of the evidence.

## A. Manheim Creates The EB-5 Business.

In 2011, Manheim learned about the EB-5 program. That federal program offers foreign nationals preferential access to permanent resident status if they invest at least $500,000 in a job-creating enterprise.

Manheim envisioned using EB-5 investments for public infrastructure projects. That would give foreign investors the benefit of an investment backed by a

---

[3] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by an internal page number or the last three digits of the document control number. Citations in the form "PTO ¶ — refer to stipulated facts in the pre-trial order. *See* Dkt. 47. Citations in the form "Dkt. [Number]" refer to court filings.

government agency, a far stronger credit than other EB-5 programs that typically invested in private sector real estate projects. Manheim pithily described his vison as a plan "to staple a Green Card to a muni bond and sell it onshore in Asia."[4]

In 2012, Manheim formed DVRC to pursue his business plan (the "EB-5 Business"). WestCo acted as DVRC's sole member and manager.

At the time, Manheim worked at an investment firm, and he invited the firm's two owners to join the business. Paula Mandle, the firm's CEO, accepted. Manheim received a 70% ownership stake in WestCo, with Mandle owning the other 30%.

## B.  Ban Joins The EB-5 Business, and Bamford Supplies Financing.

Shortly after Manheim envisioned the EB-5 Business, Ban started work at the same investment firm. Manheim assigned him to the EB-5 project, and Ban began contributing immediately. Mandle, by contrast, had no real involvement in the EB-5 Business. In December 2012, Mandle sold half of her 30% interest in WestCo to Ban for $150, leaving each of them with a 15% stake.

Manheim estimated that it would take approximately $1 million to launch the EB-5 Business. He obtained an initial $500,000 from Joseph Bamford, a childhood friend and scion of a wealthy British family. The financing took the form of a debt instrument convertible into as much as 49% of WestCo's equity.

---

[4] *Bamford*, 2022 WL 2278867, at *4.

5

**C.      The EB-5 Business Obtains Authorization To Sign Up Investors.**

In 2014, the United States Citizenship and Immigration Services ("USCIS") authorized DVRC to raise money from foreign investors. But until DVRC secured an additional round of regulatory approvals, DVRC could not invest any of the capital. And until DVRC began making investments, DVRC could not charge fees.

Manheim turned to Bamford for another $500,000 loan. If Bamford converted both loans, he could receive just under 80% of WestCo's equity.

Obtaining the 2024 USCIS approval was a significant milestone on the road to a viable company, so Ban asked Manheim for a written agreement allocating the returns from the EB-5 Business. They agreed to share equally in the returns, no matter how they were received.

Over the next two years, Manheim and Ban lined up hundreds of investors, largely from the People's Republic of China. DVRC held their funds in escrow until it received the next round of USCIS approvals.

**D.      The EB-5 Business Obtains Authorization To Make Investments.**

In February 2016, the USCIS authorized DVRC to make investments. That meant DVRC could deploy the investors' capital and begin charging fees.

With the prospect of cash flows on the horizon, Manheim, Ban, and Bamford began discussing how to reorganize their ownership stakes. At that time, DVRC remained a wholly owned subsidiary of WestCo. The economic returns from DVRC, however, were divvied up under a complex series of arrangements that included (i) Manheim, Ban, and Mandle's ownership stakes in WestCo, (ii) Bamford's beneficial

interest in WestCo through his convertible loans, and (iii) Manheim and Ban's side agreement about splitting their share of the returns from the EB-5 Business. A reorganization would simplify that complex structure.

Proposed federal legislation also loomed. If passed, it would prohibit a foreign national from having an ownership stake in an EB-5 center. Bamford was a British citizen, so giving him a direct ownership stake in DVRC could put the EB-5 Business at risk.

Manheim ultimately convinced Ban and Bamford to create Penfold. That entity would own a 90% member interest in DVRC, and Bamford, Ban, and Manheim would each own a one-third limited partnership interest in Penfold. Manheim would control Penfold through ReathCo, while continuing to control DVRC through WestCo. In return, Ban would give his right to split returns equally with Manheim, and Bamford would give up the convertible debt that potentially gave him control of WestCo. Otherwise, there would be no change in ownership at the WestCo level. Manheim would continue to own 70% of WestCo's shares, and Ban and Mandle would continue to split the remaining 30%.

After completing the reorganization, DVRC made its first investment through a fund called DVRC Pennsylvania Turnpike LP ("PTC I"). As of May 2016, PTC I was fully subscribed with 400 limited partners, each of whom contributed $550,000 to the fund. Of that amount, $50,000 was a syndication fee payable to DVRC, which DVRC shared with the agents based in Asia who helped locate the investors. The other $500,000 was a capital contribution to PTC I designated for a qualifying investment

7

under the EB-5 Program. In total, the limited partners contributed $220 million, with $20 million for syndication fees and $200 million for investment. PTC I loaned the $200 million to the Pennsylvania Turnpike Commission (the "Turnpike") at an interest rate of 2% annually.

DVRC next created DVRC SEPTA II LP ("SEPTA II"), which used the same structure as PTC I.[5] As of November 2019, SEPTA II had 479 limited partners. In total, the limited partners contributed $263.45 million in capital, with $23.95 million for syndication fees and $239.5 million for investment. SEPTA II loaned the $239.5 million to SEPTA at an interest rate of 2% annually.

DVRC followed SEPTA II with DVRC Pennsylvania Turnpike II LP ("PTC II").[6] As of January 2021, PTC II had 367 investors who had contributed a total of $201.85 million in capital, with $18.35 million for syndication fees and $183.5 million for qualifying investments. PTC II loaned the $183.5 million to the Turnpike at a rate of 2% annually.

As the general partner of each fund, DVRC received a carried interest equal to 75% of the profits that each fund generated. That meant DVRC received 75% of the 2% in annual interest paid on the funds' loans. DVRC also received a management

---

[5] The SEPTA II fund was DVRC's second EB-5 fund, hence the "II." There was no SEPTA I.

[6] Under the naming convention that produced SEPTA II, the next fund should have been PTC III, but Manheim and Ban were nothing if not inconsistent in their documentation.

fee equal to 0.25% of its assets under management ("AUM"). Because the AUM equaled the total of the loans, DVRC received 87.5% of the 2% in interest that the Turnpike and SEPTA paid. With loans totaling $623 million, that equated to approximately $11 million per year.

During this period, Manheim caused WestCo to hire Frank Manheim,[7] his brother. He also caused WestCo to hire Albert Mezzaroba, a longtime friend with close ties to the Turnpike and SEPTA. Manheim paid them healthy salaries. They also became members of the WestCo board of directors (the "WestCo Board"), joining Manheim, Ban, and Bamford.

With the money flowing, Manheim engaged in self-dealing. He reimbursed himself for lavish expenses. He also diverted cash to ReathCo.

Manheim worried that Ban or Bamford might challenge his actions, so he sought to give himself the upper hand. In February 2018, Manheim unilaterally adopted a new LLC agreement for DVRC (the "Fourth LLC Agreement"). In addition to an expansive right to exculpation, the Fourth LLC Agreement contained the DVRC Redemption Right.

---

[7] I normally identify individuals by their last name without honorifics. In this case, two of the key individuals have the same last name. To avoid confusion, this decision refers to Frank Manheim as "Frank," without implying familiarity or intending disrespect.

### E.	The Penfold Litigation

As Manheim anticipated, Ban found out about and objected to Manheim's self-dealing. Their relationship grew adversarial, and in May 2018, Manheim suspended Ban for alleged misconduct. Meanwhile Bamford had grown frustrated that DVRC was not paying more in distributions, so he contacted Ban to find out what was up. Ban told Bamford that Manheim was trying to force him out and taking lots of money from the business. Soon, Ban and Bamford were discussing how they could take control of DVRC. Ban began assembling documents. He also reached out to lawyers.

The WestCo Board met on June 28, 2018. Manheim moved to terminate Ban, and Manheim, Frank, and Mezzaroba voted in favor. Bamford abstained. After the meeting, Manheim acted in his capacity as majority stockholder to remove Ban as a director.

On July 9, 2018, Bamford sent DVRC a books and records demand that asked for thirty-six categories of documents. Manheim, Frank, and Mezzaroba decided that Bamford posed a threat to DVRC. Manheim therefore removed Bamford from the WestCo Board.

On January 4, 2019, Bamford sued Manheim, and Ban later joined (the "Penfold Litigation"). By trial, the Penfold Litigation focused on three issues:

- Manheim paying unjustified salaries and bonuses to Frank and Mezzaroba to secure their loyalty.

- Manheim causing DVRC to pay millions of dollars to ReathCo without proper justification.

- Manheim wrongfully terminating Ban.

After trial, the court held that Manheim breached his fiduciary duties and entered judgment for DVRC in the amount of $2,365,809.22 (the "Award"). Ban sought to have the Award converted from a derivative recovery into an investor-level recovery, but the court declined to take that step.

Manheim never paid the Award. At trial, Manheim implied that he had satisfied it, but that was not true, and he conceded on cross-examination that he has not paid a dollar. Manheim claimed that he executed and delivered a promissory note to DVRC, but the note did not satisfy the Award.

Meanwhile, DVRC made no effort to collect on the Award. Instead, DVRC made a $2,000,000 distribution to Manheim. In hindsight, the court should have awarded an investor-level recovery in the Penfold Litigation.

## F. DVRC Faces Challenges.

While the Penfold Litigation was unfolding, the Turnpike and SEPTA began repaying their loans. That posed a problem for DVRC, because the EB-5 program required that an investor's capital remain "at risk" until the investor could file an I-829 application to receive final approval for permanent residency. As the loans matured, DVRC needed to redeploy the capital into qualifying investments. Otherwise the investors risked disqualification from the EB-5 program.

DVRC also faced a more existential threat. On June 30, 2021, the EB-5 program expired. But on March 15, 2022, Congress enacted the EB-5 Reform And Integrity Act (the "Reform Act"), which reauthorized the EB-5 program and extended its life through September 30, 2027.

The Reform Act sought to address concerns about abuse by imposing stricter ownership requirements on EB-5 centers. One limitation required that any person involved in a center be a United States citizen or permanent resident.[8] The Secretary of Homeland Security could suspend or terminate a center's participation in the EB-5 program if the center knowingly violated the ownership requirement and failed to take "commercially reasonable efforts to discontinue the prohibited person's involvement."[9] Bamford was a British citizen, and it was unclear to what extent his involvement through Penfold jeopardized DVRC's status.

But the Reform Act was not all bad. It potentially benefited DVRC by setting aside 2% of the annual allotment of EB-5 visas for participants who invested in infrastructure projects.[10] DVRC was the only center that invested in infrastructure products, so DVRC's clients had preferential access to the allotted visas. That opportunity particularly benefited participants from China, because so many Chinese had applied for EB-5 visas that they faced multi-year delays. With access to the

---

[8] 8 U.S.C. § 1153(b)(5)(H)(ii)(I) ("A person may not be involved with a regional center unless the person . . . is a national of the United States or an individual who has been lawfully admitted for permanent residence."); *see id.* § 1153(b)(5)(H)(ii)(II) ("No agency, official, or other similar entity or representative of a foreign government entity may provide capital to, or be directly or indirectly involved with the ownership or administration of, a regional center.").

[9] *Id.* § 1153(b)(5)(H)(ii).

[10] *Id.* § 1153(b)(5)(B)(i)(I)(cc).

allotment program, DVRC's Chinese investors could qualify to submit their I-829 applications within about three years.

But the USCIS interpreted the visa set-aside as applying only to post-Reform Act applicants. DVRC challenged that interpretation in court, but the court dismissed the case.[11]

## G.    Manheim Redeploys The Funds' Capital.

To address the need to keep the EB-5 investors' money at risk, Manheim pooled the repaid capital in a new investment vehicle: Redeployment Partners LP ("RDLP"). According to Manheim, the Turnpike and SEPTA did not need more capital, and he could not locate other infrastructure projects.

Manheim therefore shifted DVRC's focus to real estate. In February 2022, he caused DVRC to contribute $300 million in repaid loan proceeds RDLP. In November, Manheim caused DVRC to contribute another $233 million in repaid loan proceeds to RDLP. Later that month, he caused RDLP to loan $233 to a special purpose vehicle: 200 West Washington Square, LLC ("St. James LLC"). RDLP structured the loan to St. James LLC as a ten-year interest-only loan, with no principal repayments due until maturity. The loan paid interest at a fixed rate of 4% annually. At the time, Manheim owned a 68% interest in St. James LLC, and Frank and Mezzaroba each owned a 16% interest. The loan was obviously a self-interested transaction.

---

[11] *Delaware Valley Reg'l Ctr. v. U.S. Dep't of Homeland Sec.*, 678 F. Supp. 3d 73 (D.D.C. 2023), *aff'd,* 106 F.4th 1195 (D.C. Cir. 2024).

That same month, St. James LLC used the DVRC loan to fund 99.15% of the purchase price for the St. James Building, a forty-five story luxury residential building on the west side of Philadelphia's historic Washington Square. Meanwhile, DVRC distributed $2 million to Manheim, which he used to pay the remaining 0.85% of the purchase price. Frank and Mezzaroba did not contribute any capital to St. James LLC or to the purchase of the St. James Building.

## H. The WestCo Call

On May 10, 2022, Manheim acted by written consent to adopt a bylaw containing the WestCo Call Right. It appeared in a new Article X, titled "Majority Stockholder Repurchase Right." Section 1(a) provided as follows: "A Stockholder or Stockholders holding a majority of the outstanding shares of the Company (the 'Purchasing Stockholder(s)') may vote to purchase, or for an affiliate(s) [sic] of the Purchasing Stockholder(s) to purchase some or all shares of any or all other stockholders."[12]

The WestCo Call Right provided that the affected stockholder lost all rights as a stockholder immediately upon a "Repurchase Vote" and, from that time on, was a creditor of the company.[13] The bylaw called for the transaction to take place at "fair market value" and gave the Purchasing Stockholder ninety days from the date of

---

[12] JX 103.

[13] *Id.* art. X, § 1(g).

14

notice to pay the affected stockholder "in one lump sum payment."[14] But there was more: If the affected stockholder challenged the repurchase or the determination of fair market value, then "the Purchaser's [sic] obligation to pay any part of the Repurchase Price shall be suspended until such action, suit or proceeding is resolved through a final judgment or decision that is no longer subject to appeal."[15]

The same day that he amended the bylaws, Manheim exercised the WestCo Call Right to buy Ban's 150 shares for $100 per share (the "WestCo Call"). Manheim initially delivered a notice to WestCo in which he claimed to have determined that $100 per share was "the fair market value of such shares, in accordance with the provisions of Article X of the Bylaws of the Company."[16] That statement, however, was not true. Manheim had done nothing to determine the fair value of the shares. He simply wanted to put a number out there that would force Ban to counter and start a negotiation.[17] At trial, he claimed that he "couldn't really justify any number," but he "didn't want it to be zero because that just didn't make sense either. … So [he] used $100 to kind of create a notional amount."[18]

---

[14] *Id.* art. X, § 1(c).

[15] *Id.* X, § 1(c).

[16] JX 102.

[17] Manheim Tr. 387.

[18] *Id.*

The WestCo Call Right required that the affected stockholder receive notice of the purchase within thirty days. Manheim failed to comply with that self-imposed requirement. He therefore started over, and on June 17, 2022, executed and delivered a second Notice of Exercise of Repurchase Right.[19] The second notice reiterated Manheim's false claim to have determined that $100 per share "represents the fair market value of such shares."[20]

Around thirty days later, Manheim executed a document titled Notice Of Action By Written Consent And Notice Of Exercise Of Repurchase and sent it to Ban.[21] That notice purported to satisfy the terms of the WestCo Call Right.

## I. The DVRC Redemption

Manheim also eliminated the indirect interest in DVRC that Ban held through Penfold. At a meeting of the WestCo Board on August 1, 2022, Manheim, Frank, and Mezzaroba discussed the Reform Act and whether Bamford's status as a British citizen represented a "Material Adverse Effect." The Fourth LLC Agreement. defined that term as:

> (a) a violation of a statute, rule or regulation of any Governmental Authority that is reasonably likely to have a material adverse effect on the Company, any EB-5 Fund (or any potential EB-5 Fund), the Manager, any Person which has a direct or indirect interest in the Company, any EB-5 Fund (or any potential EB-5 Fund), the Manager, or any of their respective Affiliates (each, an "MAE Party"); [or]

---

[19] JX 107.

[20] *Id.*

[21] JX 134.

16

(b) an occurrence that is reasonably likely to subject any MAE Party to any material regulatory requirement to which it would not otherwise be subject, or which is reasonably likely to materially increase any such regulatory requirement beyond what it would otherwise have been . . . .[22]

The WestCo Board deferred deciding until they could consult counsel.[23]

The next day, the WestCo Board "unanimously determined that Penfold's membership in DVRC had caused a Material Adverse Effect" and exercised the DVRC Redemption Right. That provision stated:

> **Transfers Upon the Occurrence of an Event that has a Material Adverse Effect.** Upon the occurrence of an event that, in the sole and absolute discretion of the Manager, causes a Material Adverse Effect, the Company may elect to purchase from any Member causing such event, and, if so elected, such Member shall sell, all of the Membership Interest of such Member to the Company for a purchase price equal to (x) [fair market value][24] or (y) the then balance of such Member's Capital

---

[22] JX 51 at '045.

[23] *Id.*

[24] The provision used the defined term "Determined Amount." In dense legalese, the Fourth LLC Agreement defined that term as follows:

> As used in this Agreement, the term "Determined Amount" (i) means the amount agreed upon (at the time of the applicable purchase) as the purchase price for such Membership Interest by the written consent or agreement of (x) the Manager and (z) the Person who would receive such agreed upon amount or, (ii) in the absence of such an applicable agreement, means the "Appraised Value" of such Membership Interest as defined in, and determined in accordance with, Annex II hereto. The Determined Amount as determined in the manner prescribed in this Agreement shall be binding upon the Company, the Members and/or the estate or legal representative of a Member and/or any purported transferee of a Member.

17

Account (without any adjustments pursuant to Section 4.6), whichever is lower.[25]

To exercise the DVRC Redemption Right, Manheim caused DVRC to send Penfold a redemption notice. Since Manheim managed Penfold through ReathCo, he sent the notice to himself.

DVRC hired Excel Partners, a valuation firm, to determine the Appraised Value of Penfold's interests. Excel determined that the fair market value of DVRC's equity as a whole was $11.5 million. After applying a 15% discount for lack of marketability, Excel determined that the value of DVRC's equity was $9.8 million. Excel valued Penfold's 90% interest in DVRC at roughly $8.82 million (i.e., 90% of $9.8 million).[26]

Manheim claimed to have determined that Penfold's capital account balance was approximately $5 million, including its share of the Award. During discovery, Manheim produced no documents to support his calculations, so the court ruled that

---

JX 51, § 9.5. In Annex II, the Fourth LLC Agreement established an appraisal mechanism that called for valuing the member interests at "the fair market enterprise valuation of the Company and its subsidiaries as a whole and as a going concern" with the additional caveat that "the Appraised Value shall be reduced or decreased by any minority or other applicable and appropriate discount." *Id.* ann. II.

[25] JX 51 § 9.7.

[26] JX 172.

it would "proceed on the assumption that there were no documents that supported the book value."[27]

On December 15, 2022, the WestCo Board approved a payment of $3,672,868.58 to Penfold to redeem its member interest in DVRC. That amount was based on the purported capital account balance, not the Excel valuation. With no documentation to support the capital account calculation, and having evaluated Manheim's credibility, the court finds that he set the redemption price arbitrarily.

WestCo paid $1,212,046.63 in cash and the remaining $2,460,821.95 in the form of a non-cash distribution.[28] The precise mechanism for paying the non-cash component does not appear in the record. For purposes of this litigation, the court treats the balance as unpaid.

## J. This Litigation

On August 29, 2022, Ban filed this action to challenge Manheim's purchase of his ownership interest in WestCo. On December 29, 2022, Ban filed a second action

---

[27] Tr. 432–33; *see Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1119 n.7 (Del. 1994) ("[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse."); *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985) ("It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." (citing *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) and *Deberry v. State*, 457 A.2d 744, 754 (Del. 1983))), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 791 n.510 (Del. Ch. 2017) (quoting *Kahn v. Lynch* and *Smith v. Van Gorkom*); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 300–01 & n.7 (Del. Ch. 2000) (same).

[28] *See* JX 168.

19

challenging DVRC's redemption of Penfold's interest. The court consolidated the actions, and they proceeded through trial.

## II. LEGAL ANALYSIS

The outcome of this case turns on the validity and fairness of the WestCo Call and DVRC Redemption. Ban proved that the WestCo Call was not validly effectuated, giving rise to rescission as a possible remedy. Ban also proved that both were interested transactions. That meant that Manheim had to prove that the WestCo Call was fair. In theory, Manheim, Frank, and Mezzaroba had to prove that the DVRC Redemption was fair, but Ban did not sue Frank or Mezzaroba. Manheim therefore bore that burden.

Manheim largely punted on the issue of liability, choosing to fight on the issue of damages. This decision holds Manheim liable in the amount of $6,898,612, plus pre- and post-judgment interest, and less any cash distribution Ban already received.

## A. The WestCo Call

Ban first challenges the WestCo Call, in which Manheim relied on the WestCo Call Right to eliminate Ban from WestCo for $100 per share. The WestCo Call Right could not apply to Ban's shares without his assent, rendering its exercise statutorily invalid. Ban also proved that the WestCo Call was a self-interested transaction, and Manheim failed to prove that it was fair.

20

### 1. Statutory Ineffectiveness

To carry out the WestCo Call, Manheim relied on the WestCo Call Right. But Ban never consented to the WestCo Call Right, so Manheim could not rely on it to acquire Ban's shares.

Manheim argues that the WestCo Call Right is valid under Section 109 of the DGCL, which states that "the power to adopt, amend or repeal bylaws shall be in the stockholders entitled to vote."[29] Section 109(b) further authorizes the bylaws to contain "any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."[30] Manheim argues that the WestCo Call Right is a provision relating to the rights and powers of its stockholders and therefore valid under Section 109(b).

That is all true, but a more specific section of the DGCL does not allow a bylaw to impose a call right on already-issued shares without the stockholder's assent. Section 202(b) of the DGCL states:

> A restriction on the transfer or registration of transfer of securities of a corporation … may be imposed by the certificate of incorporation or by the bylaws or by an agreement among any number of security holders or among such holders and the corporation. *No restrictions so imposed shall be binding with respect to the securities issued prior to the adoption*

---

[29] 8 *Del. C.* § 109(a).

[30] *Id.*

21

*of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.*[31]

Section 202(c) identifies a non-exclusive list of provisions that qualify as transfer restrictions, including an obligation "to sell or transfer an amount of restricted securities . . . to any other holders of securities of the corporation."[32] Another is a provision that "causes or results in the automatic sale or transfer of an amount of restricted securities . . . to any holders of securities of the corporation."[33]

The WestCo Call Right imposes a restriction contemplated by Section 202(c). WestCo issued shares to Ban years before Manheim adopted the WestCo Call Right. For previously issued shares, Section 202(b) only allows a restriction if "the holders of the securities are parties to an agreement or voted in favor of the restriction."[34] Ban did not agree to the WestCo Call Right, nor did he vote for it. Manheim therefore could not rely on the WestCo Call Right to acquire Ban's shares.

Faced with the plain language of Section 202(a), Manheim argued that the assent requirement in Section 202(a) only applies to a restriction triggered when a stockholder seeks to transfer its shares. According to that theory, if the WestCo Call Right applied once Ban sought to transfer his shares, then Section 202 would require

---

[31] 8 *Del C.* § 202(b) (emphasis added).

[32] *Id.* § 202(c)(4).

[33] *Id.*

[34] *Id.* § 202(b).

22

Ban's assent before it could be validly exercised. But according to Manheim, nothing in Section 202 prevents the WestCo Call Right from giving Manheim the right to purchase the shares generally, whenever he wanted to exercise it.[35]

That argument is unpersuasive. Section 202(b) states that "no restrictions so imposed shall be binding with respect to the securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction."[36] The plain language of Section 202(c) establishes that the WestCo Call Right is a restriction governed by the statute. The WestCo Call Right deems a stockholder to have sold its shares to the majority stockholder upon exercise of the right. It is therefore an obligation "to sell or transfer an amount of restricted securities . . . to any other holders of securities of the corporation."[37] More aptly, it is a provision that "causes or results in the automatic sale or transfer of an amount of restricted securities . . . to any holders of securities of the corporation."[38] Section 202 requires stockholder consent before such a restriction can apply to already-issued shares.

Nothing in Section 202 suggests, explicitly or implicitly, that the requirement to obtain a stockholder's assent to a post-issuance restriction only applies to

---

[35] *See* Dkt. 68 at 36.

[36] 8 *Del. C.* § 202(b).

[37] *Id.* § 202(c)(4).

[38] *Id.*

provisions that operate after the stockholder seeks to transfer its shares. Such a rule would be strange, because it would require stockholder assent for the narrower right (a call right contingent on transfer) without requiring stockholder asset for the broader right (a call right not contingent on transfer). That's backwards. A call right imposes less of a burden on ownership when triggered after a stockholder has already decided to sell. A call right imposes a greater burden on ownership when it gives the holder the unilateral right to exercise it at any time. Manheim has offered no explanation for such an odd rule.

Because Ban neither agreed to nor voted for the WestCo Call Right, Manheim could not rely on it to acquire Ban's shares. Manheim's purchase of Ban's WestCo shares was therefore statutorily invalid. Ban is entitled to have the transaction rescinded or to receive damages.[39]

## 2. Fiduciary Breach

Ban separately proved that Manheim breached his duty of loyalty by adopting and exercising the WestCo Call Right. The adoption and exercise of the WestCo Call Right was a self-interested act, and Manheim failed to prove that his action was fair.

---

[39] Ban also observes that WestCo's bylaws contemplate that any bylaw amendment take place at a duly noticed meeting of stockholders. *See* JX 2. By statute, Delaware law authorizes stockholders to act by written consent unless the certificate of incorporation provides otherwise. 8 *Del. C.* § 228. WestCo's certificate does not provide otherwise, and its bylaws could not override the statutory authority to act by written consent. Ban therefore cannot complain that Manheim amended the bylaws by written consent rather than at a meeting.

24

### a.    Adopting The WestCo Call Right

Delaware law imposes fiduciary duties on a person who controls an entity.[40] Under Delaware law, a controlling stockholder owes fiduciary duties when exercising stockholder-level rights to change the status quo.[41] Although a stockholder can normally vote its shares as it wishes, a controlling stockholder's ability to use its voting power to change the status quo "must yield, however, when a corporate decision implicates a controller's duty of loyalty."[42]

---

[40] *See Brookfield Asset Mgmt., Inc. v. Resson*, 261 A.3d 1251, 1273 (Del. 2022) ("Controlling stockholders owe fiduciary duties to minority stockholders, but they also owe fiduciary duties to the corporation."); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *36 (Del. Ch. May 6, 2021) ("Delaware law imposes fiduciary duties on those who effectively control a corporation." (quoting *Quadrant Structured Prods. Co. V. Vertin*, 102 A.3d 155, 183–84); *Voigt v. Metcalf*, 2020 WL 614999, at *11)).

[41] *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 507 (Del. Ch.), *modified on reargument,* 2024 WL 3555781 (Del. Ch. 2024).

[42] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018); *accord Thorpe v. CERBCO, Inc. (Thorpe II)*, 676 A.2d 436, 442 (Del. 1996) (admonishing that a majority stockholder's "statutorily conferred power" to vote down a transaction "must be exercised within the constraints of the duty of loyalty"); *see Adams v. Clearance Corp.*, 121 A.2d 302, 306 (Del. 1956) ("When the directors, or the majority stockholders, exercise a power that the general corporation law confers upon them, it is competent for anyone who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise." (cleaned up)). *See generally Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. *They are limited only by any fiduciary duty owed to other stockholders.* It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, *so long as they violate no duty owed other shareholders.*" (emphasis added)); *Tanzer v. Int'l Gen. Indus., Inc.*, 379 A.2d 1121, 1124 (Del. 1977) ("In sum, for more than fifty years our Courts have held, consistent with the general law on the subject, that a stockholder in a Delaware corporation has

Three decisions show that a controlling stockholder owes fiduciary duties when amending a corporation's bylaws. In *Frantz*,[43] the Delaware Supreme Court upheld a majority controller's adoption of a bylaw that increased the quorum requirement for board meetings and required a unanimous vote for director action. The controller implemented the bylaw amendment to prevent the incumbent board from diluting the controller's stake, which the incumbent directors believed was in the best interests of the corporation. In a clipped and enigmatic ruling, the justices described the bylaw amendment as "a permissible part of [the stockholder's] attempt to avoid its disenfranchisement as a majority shareholder" and concluded that the amendment was "not inequitable under the circumstances."[44] The decision thus suggests that the justices thought the controller owed duties when amending the bylaws, but that the controller could act legitimately to protect its majority stake against dilution and maintain the status quo. The Delaware Supreme Court later took this same position in *Thorpe II*, holding that the majority controllers there owed

---

a right to vote his shares in his own interest, including the expectation of personal profit, *limited, of course, by any duty he owes to other stockholders*." (emphasis added)), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 704 (Del. 1983) (overruling business purpose test); *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 53 A.2d 441, 447 (Del. 1947) ("Generally speaking, a shareholder may exercise wide liberality of judgment in the matter of voting, and it is not objectionable that his motives may be for personal profit, or determined by whims or caprice, *so long as he violates no duty owed his fellow shareholders*." (emphasis added)).

[43] *Frantz Mfg. Co. v. EAC Indus. Inc.*, 501 A.2d 401 (Del. 1985).

[44] *Id.* at 407, 409.

fiduciary duties when voting, but could have permissibly vetoed a proposed sale of assets that would have dramatically altered the status quo.[45]

In *Hollinger*,[46] by contrast, this court invalidated a similar unanimity bylaw as a breach of fiduciary duty by a controlling stockholder.[47] The controller had committed in writing to support a sale process overseen by the controlled company's board. The controller subsequently sought to implement a different transaction that was in his own best interest. To prevent the board from blocking his efforts, he adopted a *Frantz*-style bylaw that increased the quorum requirement and required unanimity for board action. Writing while a Vice Chancellor, Chief Justice Strine found that the amendments sought to "disable[ ] the [company] board from protecting the company from his wrongful acts."[48] He concluded that the amendments "were clearly adopted for an inequitable purpose and have an inequitable effect" because they interfered with the board's ability to maximize value under the strategic process the controller had agreed to support.[49] Put differently, the bylaw amendments injured

---

[45] 676 A.2d at 442 (rejecting argument that a controller acted in a non-fiduciary capacity when voting; citing *Bershad*, 535 A.2d at 845; and *Ringling Bros-Barnum & Bailey*, 53 A.2d at 447).

[46] *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

[47] *Id.* at 1030.

[48] *Id.* at 1029–30.

[49] *Id.* at 1080.

the company by interfering with the board's rights under the sale process agreement.[50] The sale process agreement had defined the status quo, and the controller breached his duty of loyalty by intentionally using his stockholder power to change it, knowingly harming the company in the process. In an abbreviated decision, the Delaware Supreme Court affirmed.[51]

More recently, in *Sears Hometown*, this court held that a controlling stockholder had not breached his fiduciary duties by using his stockholder voting power to block a special committee from liquidating one of a company's two divisions while continuing to operate the other. Believing that strategy would be disastrous, the controller amended the company's bylaws to require that the liquidation receive approval from 90% of the board, at two separate board votes, taken at least thirty business days apart. If the liquidation received the necessary vote at the first meeting, then the bylaw required that the board disclose that fact. Although the bylaw technically did not prevent the board from pursuing the liquidation, as a practical matter it created a window during which the controller could take additional action before the second meeting to block the liquidation, and the controller conceded at trial that he would not have allowed the liquidation to proceed. The controller also acted by written consent to remove two directors from the board, which had the effect of also removing them from the special committee. The controller testified candidly

---

[50] *Id.* at 1082.

[51] *Hollinger*, 872 A.2d 559.

at trial that he thought those directors were wedded to the liquidation and impediments to an alternative deal.[52]

On those facts, the court held that the controller owed fiduciary duties when amending the bylaws and removing the directors, with those duties manifesting as an obligation not to harm the company or its stockholders "knowingly or through grossly negligent action."[53] Unlike in *Frantz* and *Hollinger*, which did not apply a standard of review to evaluate whether the controller breached its duties, the *Sears Hometown* decision chose to evaluate the controller's conduct through the lens of a standard of review. In *Sears Hometown*, the court observed that enhanced scrutiny, Delaware's intermediate standard of review, applies when a board of directors takes action in a setting marked by two features: (i) a specific, recurring, and identifiable context where the realities of the situation could subtly undermine the decisions of even independent and disinterested directors, and (ii) action that intruded into a space where stockholders possess rights of their own.[54] The court reasoned that when the controller amended the bylaws and removed two directors, he faced a similarly fraught scenario in which the controller's fiduciary decision-making could have been undermined by his proximity to the dispute, *and* where the controller's action intruded on space where the board possesses governance rights of its own. Therefore,

---

[52] *See Sears Hometown,* 309 A.3d at 500.

[53] *Id.* at 512.

[54] *Id.* at 514–15.

29

enhanced scrutiny logically applied.[55] Applying a reasonableness standard under enhanced scrutiny also comported with Delaware's baseline test for evaluating bylaws, which requires that "bylaws must be reasonable in their application"[56] and cannot be adopted for an inequitable purpose.[57]

In *Sears Hometown*, the bylaw amendment did not involve clearly self-interested conduct.[58] Instead, the merits of the special committee's business plan presented debatable questions about the corporation's direction. Applying enhanced scrutiny, the court found that the controller proved he (i) "acted in good faith for a legitimate objective and had a reasonable basis for believing that action was necessary," and (ii) "selected a reasonable means for achieving his legitimate objective."[59]

The *Sears Hometown* decision did not conclude that enhanced scrutiny was the only standard that could apply to a controller's intervention via bylaw amendment. Nor did the *Sears Hometown* decision rule out the possibility that entire fairness

[55] *Id.*

[56] *Frantz*, 501 A.2d at 407; *see State v. Jessup & Moore Paper Co.*, 77 A. 16, 19–20 (Del. 1910) (treating as settled that bylaws must not be unreasonable).

[57] *See ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558–60 (Del. 2014) (noting that "[b]ylaws that may otherwise be facially valid will not be enforced if adopted or used for an inequitable purpose" and stating that "[t]he intent to deter litigation, however, is not invariably an improper purpose.").

[58] *Sears*. 309 A.3d at 516.

[59] *Id.*

could apply. To the contrary, "[w]hen a fiduciary who controls an entity engages in self-dealing, then equity requires that the fiduciary prove that the self-dealing transaction as entirely fair to the entity and its minority investors."[60]

In this case, Manheim's adoption of the WestCo Call Right constituted self-interested conduct. The WestCo Call Right gave Manheim the power to acquire a minority stockholder's shares at any time he wanted at a price he determined to be "fair market value."[61] The WestCo Call Right conferred no reciprocal right on minority stockholders, and it contained no procedural protections. By giving himself the novel and expansive power to force a sale of a minority stockholder's shares without board approval, a stockholder vote, or any procedural safeguards, Manheim acted in his own self-interest. Therefore, rather than warranting the application of enhanced scrutiny, Manheim's adoption of the WestCo Call Right warrants the application of the entire fairness test.[62]

_____

[60] *Bamford*, 2022 WL 2278867, at \*36; *accord Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).

[61] JX 108.

[62] Manheim adopted the WestCo Call Right and exercised it on the same day, making it unnecessary for the court to delve deeply into the implications of the Delaware Supreme Court's recent *TripAdvisor* decision. *See Maffei v. Palkon (TripAdvisor)*, --- A.3d ---, 2025 WL 384054 (Del. Feb. 4, 2025). There, the justices held that it was not reasonably conceivable that fiduciaries could receive a material, non-ratable benefit from converting a Delaware entity into an entity governed by the laws of a jurisdiction that provided inferably greater protection against liability to those same fiduciaries. As a result, the justices held at the pleading stage that the business judgment rule, rather than the entire fairness test, applied to the conversion, warranting dismissal. *Id.* at \*18. That conclusion rested on an intuition

that the effect of an increase in liability protection and the concomitant diminution in litigation risk becomes speculative and immaterial unless a transaction that could give rise to litigation has occurred or is temporally imminent. *See id.* at \*21, \*26.

That intuition remains one I do not share. People plan ahead—often far ahead. Sophisticated people like directors and officers, aided by expert lawyers, invariably plan far ahead. Lawyers spend hours negotiating contracts because their clients want them to address non-imminent legal risks. Corporations obtain D&O insurance because people plan for non-imminent legal risks. Private equity firms think about exit before they invest. Activist preparedness (like takeover preparedness before it) is big business. Nor is that intuition one that the Delaware Supreme Court has always followed. In *QVC*, for example, the justices viewed a change of control as sufficiently material to trigger enhanced scrutiny not because the post-acquisition controller had any imminent plans for the company, but because his voting power gave him the power to implement any plan he might someday have. *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994).

Whether people regard changes in non-imminent legal risk as material is a legislative fact. That concept refers to the empirical assumptions about the world that courts necessarily make when deciding cases. *See generally* Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 502–503 (2002).

Less than two weeks after the *TripAdvisor* decision, the Delaware General Assembly provided a natural experiment when State Senator Bryan Townsend introduced Senate Bill 21 (the "DExit Amendments"). The purpose of the DExit Amendments was avowedly to mitigate litigation risk for fiduciaries of Delaware corporations, thereby heading off criticism that the Delaware courts had created an excessively litigious environment that had prompted some corporations to leave Delaware. Doubtless some companies were considering deals that might imminently implicate the DExit Amendments, but the amendments mainly had long term implications. They affected all Delaware corporations and all covered transactions, not just imminent transactions.

The DExit Amendments generated an unprecedented response. Proponents strongly endorsed the amendments' implications, and opponents stridently criticized them. No one suggested that the DExit Amendments were immaterial for corporations not contemplating imminent transactions. The reaction to the DExit Amendments makes it difficult to credit that a reduction in litigation exposure is

### b.    Exercising The WestCo Call Right Was A Self Interested Transaction.

Manheim likewise engaged in self-interested conduct when he exercised the WestCo Call Right. Under Delaware law, a transaction is subject to entire fairness when a controller receives a benefit not shared ratably with the corporation's stockholders.[63] Although there are times when mere exercise of a contractual right

---

immaterial for fiduciaries unless a transaction has recently occurred or is imminent. That in turn makes it difficult to apply *TripAdvisor*'s foundational intuition.

It is also unclear (at least to me) to what extent *TripAdvisor*'s imminence inquiry applies to changes to stockholder rights other than litigation rights. The materiality test is not limited to litigation rights; the logic of the imminence concept is not self-evidently limited to litigation rights; and the justices' discussion of ripeness cases as a guide for assessing temporal proximity implies a broader application. *See id.* at *26–27. In *Williams v. Geier*, for example, the Delaware Supreme Court viewed the implementation of a tenured voting provision as having no material effect on the controlling family because all of the stockholders initially would receive the same rights, even though its implications for solidifying the family's position were obvious and would quickly accrue over time as other stockholders sold shares. 671 A.2d 1368, 1370 (Del. 1996). The *Williams* decision seemingly applied the imminence concept to a governance provision, and the *TripAdvisor* decision cited *Williams* favorably. I admit to thinking that Chancellor Bouchard's analysis in *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *8–9 (Del. Ch. Dec. 11, 2017), and then-Chancellor Strine's comments in *In re Google Inc. Class C Stockholder Litigation*, C.A. No. 7469–CS, at 95–96 (Del. Ch. Oct. 28, 2013) (TRANSCRIPT), had safely guided that aspect of *Williams* into an oxbow of the jurisprudential river, but *TripAdvisor* reopened the channel.

If it applies here, the imminence analysis is easy. Manheim adopted the WestCo Call Right and exercised it on the same day. Having considered the record, I find that he adopted the WestCo Call Right intending to use it imminently, as he in fact did. That answers any *TripAdvisor*-related question about temporal proximity.

[63] *Atallah v. Malone*, 2023 WL 4628774, *11 (Del. Ch. July 19, 2023) ("It is established law that the stringent standards of entire fairness review apply to a transaction in which a controller, standing on both sides, breaches his duty of loyalty

will not implicate fiduciary duties or give rise to a conflict of interest,[64] a conflict arises when the controller can use the purported right to set the terms of the transaction.

Manheim admitted at trial that he set the buyout price at $100 per share arbitrarily, without conducting any analysis. He chose the number as "a notional amount," not because he believed it reflected fair market value.[65] He purportedly hoped to start a negotiation.[66] Yet the price he set was so low that it merely prompted litigation. And by setting that arbitrary price, he benefited himself. Manheim also determined the timing of the transaction unilaterally.

When acquiring Ban's shares, Manheim stood on both sides of the transaction. His exercise of the WestCo Call Right was therefore subject to review for entire fairness.

### c. The WestCo Call Was Not Entirely Fair

Because the adoption and exercise of the WestCo Call Right were self-interested acts, Manheim bore the burden of proving that the WestCo Call was fair.

---

by extracting a benefit not shared by the other stockholders."); *In re EZCorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *15 (Del. Ch. Jan. 25, 2016) (clarifying that entire fairness review applies to transactions involving self-interested controllers outside the squeeze-out merger context).

[64] *See Nemec v. Shrader,* 991 A.2d 1120, 1127 (Del. 2010).

[65] Manheim Tr. 387.

[66] *Id.*

The entire fairness standard has two dimensions: substantive fairness (fair price) and procedural fairness (fair dealing).[67] Though a court may analyze each aspect separately, they are not distinct elements of a two-part test. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[68]

The substantive dimension of the fairness inquiry examines the transactional result. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs. The earliest freeze-outs involved corporations selling all of their assets for a package of consideration, typically cash, then dissolving and distributing the net cash to stockholders.[69] After mergers became the preferred transactional vehicle, the leading cases involved squeeze-outs in which the minority shares were converted into the right to receive a specific amount of cash.[70] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price

---

[67] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[68] *Id.*

[69] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–34 (Del. Ch. 2020) (describing history of asset sales and mergers).

[70] *Id.*

"relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[71] But the substantive dimension of the entire fairness inquiry does not focus narrowly on evaluating a price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[72]

The procedural dimension of the entire fairness inquiry examines the process that generated the result to determine how closely it replicated arms' length bargaining. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[73] In the canonical framing, it "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[74]

---

[71] *Weinberger*, 457 A.2d at 711.

[72] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial standard that "provides the minority shareholders with the value of what was taken from them . . . .").

[73] *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 430 (Del. 1997).

[74] *Weinberger*, 457 A.2d at 711.

Economic fairness can be the predominant, even dispositive dimension of the fairness inquiry.[75] But the procedural dimension also matters because the substantive dimension is usually contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[76] Consequently, the two aspects of the entire fairness standard interact."[77] "A strong record of fair dealing can influence

[75] *In re Dole Food Co. S'holder Litig..*, No. CV 8703-VCL, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015) ("Fair price can be the predominant consideration in the unitary entire fairness inquiry.").

[76] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[77] *Weinberger*, 457 A.2d at 711 ("[I]n a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger."); *Dole*, 2015 WL 5052214, at *34 ("Fair price can be the predominant consideration in the unitary entire fairness inquiry."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010) ("Price, however, is the paramount consideration because procedural aspects of the deal are circumstantial evidence of whether the price is fair."). Even a fiduciary that engaged in zero process could prove fairness at trial by establishing an indisputably fair price. Envision an altruistic controller who is the sole director of a privately held company and who owns a majority of the shares with the balance held by the company's employees. The controller wishes to eliminate the minority, but because of the controller's relationship with the employees, wants to provide a generous price. The controller prepares one-page merger agreement, approves it at the board level with a unanimous written consent, and approves it at the stockholder level by written consent. Any hallmarks of a fair process are non-existent, but even under those circumstances, a controller who proved that the price was fair would not have breached its duties. *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch.2013) (holding that fiduciaries did not breach their duties when they failed to follow a fair process yet nevertheless approved a transaction that yielded a fair price). Some Delaware decisions, however, have treated comparable scenarios as involving a

37

the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[78] If fiduciaries successful replicate arm's length bargaining, then that evidence of procedural fairness can validate a debatable substantive outcome. But the opposite is also true: a dubious process can call into question a low but nominally fair price.[79] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[80]

---

breach of duty but no damages. *See, e.g.*, *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at \*52 (Del. Ch. Sept. 4, 2014) (finding breach of duty where transaction provided a fair price but process was not fair), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at \*25 (Del. Ch. Apr. 14, 2006) (finding a breach of the duty of loyalty based on a process failure but awarding only nominal damages because of a fair price). The distinction makes a difference. An adjudicated breach of duty can have significant knock-on effects for the availability of insurance and indemnification, as well as the fiduciary's status under various regulatory regimes.

[78] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) (collecting authorities).

[79] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at \*37 (Del. Ch. July 6, 2018) ("Just as a fair process can support the price, an unfair process can taint the price."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. Nov. 4, 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 776 A.2d 437 (Del. 2000) (per curiam).

[80] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at \*19 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Del. 2018) (TABLE).

The entire fairness inquiry "is not itself a remedial calculation."[81] "For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness."[82] Once a court determines that a transaction is not entirely fair, then the court determines what remedy to award.

In this case, Manheim failed to prove that the WestCo Call was procedurally fair. Manheim adopted and exercised the WestCo Call Right unilaterally. His actions bore none of the hallmarks of procedural fairness.

- The procedural dimension of the entire fairness test considers how the transaction was timed and initiated.[83] Manheim adopted and exercised the WestCo Call Right at a time of his own choosing and unilaterally.

- The procedural dimension of the entire fairness test considers how the transaction was structured.[84] Manheim structured the WestCo Call by implementing a statutorily invalid bylaw mechanism, exercising it unilaterally at a time of his choosing, and setting an arbitrary price.

- The procedural dimension of the entire fairness test considers how the transaction was disclosed to the directors and stockholders, as well as how the approvals of the directors and the stockholders were obtained.[85] By adopting and exercising the WestCo Call Right, Manheim acted unilaterally. He did not seek or obtain director approval, much less disinterested director approval, and he did not seek or obtain disinterested stockholder approval.

---

[81] *Id.* at 465.

[82] *Dole*, 2015 WL 5052214, at *33.

[83] *Weinberger*, 457 A.2d at 711.

[84] *Id.*

[85] *Id.*

39

The WestCo Call was not procedurally fair.

Manheim also failed to prove that the WestCo Call was substantively fair. The floor for substantive fairness is whether the stockholder received "the substantial equivalent in value of what he had before."[86] Before Manheim adopted the WestCo Call Right, Ban owned WestCo shares that were his personal property and that could not be taken from him arbitrarily. Although Manheim could eliminate Ban's equity interest by merger, Ban would be entitled to the protections of Delaware law, including the right to seek appraisal after a cash-out merger.[87] After Manheim adopted the WestCo Call Right, Ban owned shares burdened by the overhang of a contractual call right which provided that the affected stockholder lost all rights as a stockholder immediately upon exercise and that if the affected stockholder challenged the repurchase, then the purchaser did not have to pay until final judgment. Ban received no compensation for losing a stick in the bundle of rights associated with his shares. He no longer held the substantial equivalent of what he had before.

Nor was the price of $100 per share in any way fair. Manheim set it unilaterally and arbitrarily. He did not obtain any appraisal or valuation, nor did he present one at trial. Instead, Manheim asserted that WestCo's shares were "arguably worth zero" because he thought WestCo was not going to own any interest in DVRC due to the Penfold Litigation. From Manheim's perspective, giving Ban anything more than zero

---

[86] *Sterling*, 93 A.2d at 114.

[87] *See* 8 *Del. C.* § 262.

would have been fair. But Manheim's assertion about that WestCo's shares being "arguably worth zero" lacked credibility. The Penfold Litigation created risk.[88] Ban and Bamford had challenged whether WestCo properly owned any interest in DVRC, but WestCo held record title. Manheim's failure to establish any hallmarks of procedural fairness further undercuts the fairness of the price. Manheim failed to prove that the WestCo Call was substantively fair.

Having failed to prove that the WestCo Call was either procedurally fair or substantively fair, Manheim failed to prove that the WestCo Call was fair. Manheim breached his duty of loyalty by engaging in the WestCo Call.

## B.    The DVRC Redemption

Ban also challenges the DVRC Redemption. Even if the DVRC Redemption Right was valid,[89] Ban proved that the DVRC Redemption was a self-interested transaction, and Manheim failed to prove that the DVRC Redemption was fair.

---

[88] *See Frontier Oil v. Holly Corp*, 2005 WL 1039027, at *36 n. 224 (Del. Ch. Apr. 29, 2005) ("In assessing whether the risk of litigation (as contrasted with the cost of litigation) may have a Material Adverse Effect, the mere existence of a lawsuit cannot be determinative."); *see also Sealy Mattress Co. of New Jersey v. Sealy, Inc.*, 532 A.2d 1324, 1336 n. 19 (Del. Ch. 1987) ("The relevant principle is that the defendants, as fiduciaries, cannot cause the litigation to remain unresolved and then take advantage of that nonresolution for their own benefit and to the minority stockholders' detriment.").

[89] Ban argued that Manheim's adoption of the Fourth LLC Agreement containing the DVRC Redemption right constituted a breach of fiduciary duty. The court need not reach that issue because the exercise of the DVRC Redemption Right was not entirely fair. That is a relief, because the importance of temporal proximity under the Delaware Supreme Court's recent *TripAdvisor* decision could loom large.

1.      **Contractual Preemption**

Manheim argues that the exercise of the DVRC Redemption Right was not a fiduciary act. In *Nemec v. Shrader*,[90] the Delaware Supreme Court introduced the doctrine of contractual preemption of fiduciary duties, holding that contractual

---

As discussed above, the *TripAdvisor* decision held that a change in the legal rights afforded stockholders—there, a change to their litigation rights—did not conceivably confer a material, non-ratable benefit on the fiduciaries making the decision unless a transaction that could give rise to litigation had recently occurred or was temporally imminent. *See* 2025 WL 384054, at *21, *26. As I have confessed, that foundational premise is not one I intuitively share, so while I will seek to apply it faithfully, it is unclear to me how imminent the transaction must be. It also not clear to me whether *TripAdvisor*'s imminence inquiry applies to changes to stockholder rights other than litigation rights. *Cf. id.* at *26-27.

Both dimensions of *TripAdvisor* would make it difficult to determine the standard of review for the adoption of the Fourth LLC Agreement containing the DVRC Redemption Right. Conceptually, adopting the Fourth LLC Agreement resembled the adoption of the WestCo Call Right: Manheim removed one of the sticks in the bundle of economic rights associated with the DVRC member interests—the right to continue holding those interests absent a major transaction like a merger—then replaced the stick after carving out the DVRC Redemption Right. After that transaction, Penfold did not possess the substantial equivalent of what it possessed before, and as the party controlling WestCo, the change accrued to Manheim's benefit. That would seem to confer a non-ratable benefit on Manheim and trigger entire fairness review. But unlike with the WestCo Call Right, Manheim's intent to use the DVRC Redemption Right imminently was far less clear. He adopted the Fourth LLC Agreement in 2018, and he did not exercise the DVRC Redemption Right until 2022. In that sense, adopting the Fourth LLC Agreement resembled converting DVRC into an entity governed by the law of a jurisdiction that gave Manheim more favorable rights, though without any imminent transaction that would take advantage of those more favorable rights. That analogy to *TripAdvisor* would suggest business judgment review. Happily, because entire fairness governs the exercise of the DVRC Redemption Right, I need not puzzle over the standard of review for adopting the Fourth LLC Agreement in a post-*TripAdvisor* world.

[90] 991 A.2d 1120 (Del. 2010).

obligations preempt overlapping fiduciary duty claims that arise out of the same set of facts. According to the *Nemec* decision,

> It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.[91]

There, two former employees contended that the defendant directors acted in their own self-interest when they caused the corporation to exercise a contractual right to redeem the plaintiffs' shares. By exercising the redemption right, the directors deprived the plaintiffs of greater consideration from a then-anticipated transaction.[92] The consideration went to the remaining stockholders, including the directors. The Delaware Supreme Court held that the contractual right preempted the fiduciary claim.[93]

Other decisions likewise hold that a claim for breach of contract occupies the field and preempts overlapping claims for breach of duty against corporate fiduciaries. For example, when addressing the implication of a voting agreement, one decision summarized the rule as follows:

> Under Delaware law, if the contract claim addresses the alleged wrongdoing by the director, any fiduciary duty claim arising out of the same conduct is superfluous. The reasoning behind this is that to allow a fiduciary duty claim to coexist in parallel with a contractual claim,

---

[91] *Id.* at 1129.

[92] *Id.* at 1125.

[93] *Id.* at 1128–29.

would undermine the primacy of contract law over fiduciary law in matters involving contractual rights and obligations.[94]

The court posited that fiduciary duty claims could only persist under "a narrow exception" that applies when "there is an independent basis for the fiduciary duty claims."[95]

In the corporate context, the *Nemec* line of authority grew out of preferred stock cases where a contract provision governed the preferred stockholders' entitlement.[96] Similar reasoning emerged in alternative entity cases.[97]

The *Nemec* principle makes sense where parties have agreed specifically on a particular outcome and memorialized that outcome by contract. There are good reasons to question whether contractual preemption applies when a fiduciary has discretion about whether to exercise a contract right and how to apply it.[98] In that

---

[94] *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (cleaned up).

[95] *Id.*

[96] The *Nemec* decision relied on two cases: *Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006) and *Gale v. Bershad*, 1998 WL 118022 (Del.Ch. Mar. 3, 1998). Both cases involved claims by preferred stockholders that the defendant directors had caused the corporation to violate the plaintiffs' preferences.

[97] *See, e.g.*, *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009); *Madison Realty Partners 7, LLC v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001), *aff'd*, 991 A.2d 1120 (Del. 2010).

[98] Scholars explain that a contract claim can coexist with a fiduciary duty claim, because fiduciary obligations overlay all rights and powers that the fiduciary can exercise. *See* Lionel D. Smith, *Contract, Consent, and Fiduciary Relationships*, in Paul B. Miller & Andrew S. Gold, Contract, Status, and Fiduciary Law, 128, 134 (Paul

setting, the discretionary decisions remain fiduciary in character. A counterparty may both challenge compliance with the contract and, if the counterparty is the

---

B. Miller & Andrew S. Gold, eds., 2016) (describing fiduciary capacity as a "transversal concept: it cuts across the sources of legal powers, since those sources may be contractual or not"); Matthew Harding, *Fiduciary Undertakings*, in Contract, Status, and Fiduciary Law*,* supra, at 79 ("The fact that a fiduciary undertaking may be made in a given contract does not bear on what counts as sufficient performance of that undertaking as a matter of contract law. It instead means that non-performance of the undertaking is susceptible of analysis in more than one frame, as involving fiduciary breach as well as breach of contract. Moreover, the promisor may be liable for fiduciary breach even in circumstances where she has fully performed her undertaking from the perspective of contract law." (footnote omitted)). Under this alternative to contractual preemption, a fiduciary can face both a claim for breach of contract and a claim for breach of fiduciary duty arising from the same conduct. *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 858 (Del. Ch. 2022). "If the contract provides the sole source of the specific prohibition, then the plaintiff only can sue in contract, because the duty only arises from the contractual relationship. If, however, the plaintiff also would have a claim under general fiduciary principles, then the plaintiff also can assert the claim for breach of fiduciary duty." *Id.* Agency law exemplifies this approach:

> The overlap between duties derived from tort law and from an agent's contract with the principal will often provide the principal with alternative remedies when a breach of duty subjects the agent to liability. In particular, an agent is subject to liability to the principal for all harm, whether past, present, or prospective, caused the principal by the agent's breach of the duties stated in this section.

Restatement (Third) of Agency § 8.08 cmt. b (Am. L. Inst. 2006).

fiduciary's beneficiary, challenge the fiduciary act.[99] That reality merely represents yet another example of Professor Berle's twice-testing principle.[100]

In this case, Manheim caused WestCo to make a discretionary decision to exercise the DVRC Redemption Right. Manheim then set the value of Penfold's capital account at an arbitrary amount. Manheim finally caused WestCo to set the price at the Manheim's arbitrary figure.

The terms of the DVRC Redemption Right did not mandate any of those three steps. Ban can pursue a claim for breach of fiduciary duty against Manheim based on his discretionary decisions.

### 2. Fiduciary Breach

Ban argues that Manheim breached his fiduciary duties by orchestrating the DVRC Redemption on terms that unfairly benefited himself. As discussed previously, a controller must prove that a transaction is fair when the controller stands on both sides of the transaction or receives a benefit not shared ratably with other investors. Manheim stood on both sides of the DVRC Redemption and failed to prove that its terms were fair.

---

[99] *See, e.g.*, *Metro Storage*, 275 A.3d at 857–58; *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 806 (Del. Ch. 2022); *Lee v. Pincus*, 2014 WL 6066108, at *7–9 (Del. Ch. Nov. 14, 2014).

[100] Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931); *see Coster v. UIP Cos., Inc.*, 255 A.3d 952, 960 (Del. 2021); *Quadrant Structured Prod. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014).

Manheim controlled DVRC. Just as a sole general partner of a limited partnership controls the entity and owes fiduciary duties,[101] so does the sole managing member of a manager-managed LLC.[102] In this case, WestCo controlled DVRC as its managing member, and Manheim controlled WestCo. Manheim therefore owed fiduciary duties to DVRC and its equity investors because he controlled DVRC.

Exercising the DVRC Redemption Right conferred a non-ratable benefit on Manheim. Before the DVRC Redemption, Manheim beneficially owned a 37% interest in DVRC. He owned one-third of the partner interest in Penfold, which owned 90% of

<hr />

[101] *See Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 172 (Del. Ch.) ("The general partner interest provides the General Partner with a 2% economic interest in El Paso MLP and, more importantly, gives the General Partner control over El Paso MLP."), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015); *see also In re Bos. Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("It is well settled that, unless limited by the limited partnership agreement, the general partner of a Delaware limited partnership [has] the fiduciary duty to manage the partnership in the partnership's interests and the interests of the limited partners." (footnotes omitted)); *James River-Pennington Inc. v. CRSS Cap., Inc.*, 1995 WL 106554, at *11 (Del. Ch. Mar. 6, 1995) ("JRP has a duty of loyalty to the Partnership and the other partner because it controls the general partner."). *See generally* Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law,* 60 Bus. Law. 1469, 1470 (2005) (noting that general partners owe fiduciary duties to the limited partnership and its limited partners because they control the partnership's property for the benefit of the partnership and its limited partners).

[102] *See Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *10 (Del. Ch. Sept. 18, 2014) ("Wentworth controlled Holdco (despite its less–than–1% interest) by virtue of its position as Holdco's sole managing member and the well-pled allegations of control over Holdco's business and affairs."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 665 (Del. Ch. 2012) ("As the managing member of AK–Feel, Feeley controls the LLC.").

the member interest in DVRC, giving Manheim a 30% beneficial interest in DVRC. Manheim also owned 70% of WestCo, which owned the remaining 10% member interest in DVRC , giving him beneficial ownership of an additional 7%. After the DVRC Redemption, WestCo was the sole member of DVRC, so Manheim's 70% ownership of WestCo translated to a 70% interest in DVRC. The DVRC Redemption nearly doubled Manheim's ownership stake in DVRC and constituted an interested transaction for Manheim.

Frank, Mezzaroba, and Manheim comprised the WestCo Board that acted as the de facto board of directors for DVRC. Ban could have sued Frank and Mezzaroba because, just as a directors of a corporate general partner owe fiduciary duties to the limited partnership and its equity holders,[103] so do the directors of a corporation that serves as the sole manager of a manager-managed LLC.[104] But Ban chose only to sue Manheim.

---

[103] *See Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003) ("Undoubtedly, a corporate general partner and the directors of that general partner owe a fiduciary duty of loyalty to a limited partnership and its limited partners."); *Bos. Celtics*, 1999 WL 641902, at *4 ("It is well settled that, unless limited by the limited partnership agreement, … the directors of a corporate General Partner who control the partnership, like the directors of a Delaware corporation, have the fiduciary duty to manage the partnership in the partnership's interests and the interests of the limited partners." (footnotes omitted)); *James River-Pennington*, 1995 WL 106554, at *11 ("[T]he JRP Directors owe a fiduciary duty of loyalty to the Partnership and any other partner.").

[104] *See In re USACafes, L.P. Litig*, 600 A.2d 43, 48 (Del. Ch. 1991) (establishing that a director, member, or officer of a corporate entity serving as the general partner of a limited partnership who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners); *see also Paige*

Because the DVRC Redemption benefitted a controller, the law governing this case imposes on Manheim the burden of proving that the exercise of DVRC Redemption Right was fair, unless he conditioned its exercise on both the approval of a duly empowered board committee and a majority of DVRC's minority members.[105] Manheim did not implement any protective devices; therefore, he must prove that the DVRC Redemption was fair.

### a.    Procedural Fairness

Manheim failed to prove the DVRC Redemption was procedurally fair. The DVRC Redemption was not all bad, but ultimately it provided a way for Manheim to eliminate Ban's interest in DVRC without a fair process.

As discussed above, the procedural dimension of entire fairness entails considering how the transaction was timed and initiated. On August 1, 2022, the WestCo Board met to consider whether Bamford's indirect ownership interest in DVRC, held through Penfold, constituted a Material Adverse Effect. Five months earlier, on March 15, 2022, Congress had enacted the Reform Act, which empowered USCIS to revoke the regulatory approvals of a center that a foreign national owned or controlled.

---

*Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011).

[105] *See In re Match Grp., Inc. Derv. Litig.*, 315 A.3d 446, 471 (Del. 2024).

At first blush, evaluating the risk posed by Bamford's involvement in WestCo seems prudent, and the timing of that decision would not appear suspect. But as to Ban, the decision smacks of pretext because the claimed MAE only related to Bamford. Ban had nothing to do with it. Although the DVRC Redemption Right applied to Penfold's equity as a whole, the WestCo Board did not consider issuing replacement equity to Ban, as it did for Manheim. When Manheim caused WestCo to exercise the DVRC Redemption Right, he did so in part to get rid of Ban.

The procedural dimension of entire fairness next considers how the transaction was structured. The exercise of the DVRC Redemption Right did not incorporate any devices designed to replicate arms' length bargaining. The process unfolded unilaterally, as Manheim intended when he adopted the Fourth LLC Agreement.

The procedural dimension of entire fairness also considers how the transaction was disclosed to the directors and stockholders and how their approvals were obtained. Disclosure often matters when an officer or the controller takes the initial steps to pursue the transaction, then brings it to the board or stockholders. That did not happen here.

Rather, the important issue involves the approvals. The WestCo Board comprised Manheim, Frank, and Mezzaroba. None of them were disinterested and independent. Manheim would nearly double his ownership interest in DVRC through the redemption, rendering him interested. Frank was Manheim's brother, compromising his independence. Mezzaroba was Manheim's long-term friend and likewise was not independent.

A board consisting entirely of compromised directors thus approved the DVRC Redemption. No one invited Bamford or Ban to present an opposing view, even though the DVRC Redemption principally affected them. No one sought approval from either Penfold's inventors or the minority investors in WestCo.

A final aspect of procedural fairness involves how the parties went about determining the terms of the transaction. The DVRC Redemption Right called for Penfold to receive the lesser of fair market value or the value of its capital account. Nothing in the record supports the fairness of that structure, which results in Penfold receiving less than fair market value whenever fair market value exceeds book value. The structure is punitive in a context where grounds for punishment were absent.

Moreover, the price paid in this case was arbitrary. Manheim personally calculated the value of Penfold's capital account, but he could not produce any supporting documentation.[106] The WestCo Board retained Excel to determine the fair market value of Penfold's interest, but that valuation exceeded the value of Penfold's capital account. Manheim used the value of Penfold's capital account, meaning that Manheim himself—the individual most interested in the outcome of the transaction— determined the price.

Taking the evidence as a whole, Manheim failed to prove that the exercise of the DVRC Redemption Right was procedurally fair.

---

[106] *See* Scherf Tr. 308–09; Manheim Tr. 432–33.

### b. Substantive Fairness

The same legal principles discussed previously apply to the court's assessment of the substantive fairness of the DVRC Redemption. In that transaction, DVRC redeemed Penfold's membership interest for $3,672,868.58, reflecting Manheim's calculation of its capital account.

Excel valued DVRC at approximately $9.7 million, implying a valuation of $8.73 million for Penfold's 90% interest.[107] The WestCo Board redeemed Penfold's interest for just 42% of that value, supporting a finding that the DVRC Redemption was not entirely fair.

The court can also consider post-transaction actions that shed light on DVRC's true economic value.[108] After the DVRC Redemption, the WestCo Board distributed $2 million to Manheim, then caused DVRC's subsidiary, RDLP, to loan $233 million to St. James LLC, a company 100% owned by Manheim, Frank, and Mezzaroba. The distribution and loan enabled St. James LLC to acquire the St. James Building.

---

[107] JX 172 at '023.

[108] *See Delaware Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310 (Del. Ch. 2006) (holding that when conducting an entire fairness review, the court "may consider all relevant, non-speculative factors bearing on its value as of the merger date."). This is particularly true in the appraisal cases, which are analogous to determining fair price of a specific transaction, especially when that transaction's price in intertwined with the value of the company as a whole. *See Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 499 (holding that post-merger evidence that validated a pre-merger forecast was admissible "to show that plans in effect at the time of merger have born fruition." (citation omitted)).

DVRC's ability to support that acquisition suggests that DVRC had value far in excess of Penfold's capital account.[109]

In the face of this evidence, Manheim failed to demonstrate that the DVRC Redemption was substantively fair. The redemption did not reflect a fair valuation of Penfold's membership interest.

### c. The Finding Regarding Fairness

The DVRC Redemption failed to satisfy either the procedural or the substantive dimensions of the entire fairness test. Ban is entitled to a remedy for the DVRC Redemption.

### 3. The Exculpation Clause

Manheim argues that he cannot be held liable for breaching his fiduciary duties in connection with DVRC Redemption because Section 11.3 of the Fourth LLC Agreement exculpates "Indemnified Persons" for all claims except for "a bad faith violation of the implied contractual covenant of good faith and fair dealing" (the "Exculpation Provision").[110] Manheim cannot rely on the Exculpation Provision because the court already held in the Penfold Litigation that Manheim did not validly adopt that provision.

"Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on

---

[109] *See* Scherf Tr. 304–05; Ban Tr. 156.

[110] JX 51 § 32.

a different cause of action involving a party to the first case."[111] Manheim was a defendant in the Penfold Litigation. There, the court held that "[t]he adoption of the Exculpatory Provision was itself a self-interested act, and it is invalid because Manheim failed to prove that the implementation of the Exculpatory Provision was entirely fair."[112] The court accordingly refused to recognize the validity of the Exculpatory Provision. That holding governs for this action as well. The Exculpation Provision has no relevance to this case.

## C.     The Other Claims

Ban separately assert claims for unjust enrichment and conversion. Because Manheim faces liability for breach of fiduciary duty, the court need not reach Ban's alternative theories.

## D.     The Remedy

Once a breach of duty has been established, this court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate" and "to grant such other relief as the facts of a particular case may dictate."[113] The Court of Chancery "has broad latitude to exercise its equitable powers"[114] and is not limited to

---

[111] *Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995).

[112] *Bamford*, 2022 WL 2278867, at *33

[113] *Weinberger*, 457 A.2d at 714.

[114] *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993); *accord Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009) ("[T]he Court of Chancery has broad discretion to craft an appropriate remedy . . . , the propriety of a court-ordered remedy is ordinarily reviewed for abuse of discretion."); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961

54

choosing among the specific proposals the parties advanced; instead, "this Court frequently has relied on its own remedial discretion to fashion a different remedy than what the parties may have requested when the circumstances so require."[115] Put more poetically, the "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff."[116]

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[117] Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded."[118] But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."[119] "[O]nce a breach

A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief.").

[115] *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011).

[116] *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12, 1992) (Allen, C.).

[117] *Thorpe II*, 676 A.2d at 445.

[118] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006).

[119] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, C.).

of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[120]

### 1. Fair Value Versus Fair Market Value

Ban asks for an award of damages. Before the Westco Call and the DVRC Redemption, Ban owned an indirect 31.5% stake in DVRC. Ban asks for an award of damages equal to the fair value of his stake.

Manheim argues that if Ban is entitled to damages, he should receive only fair *market* value, not fair value. The adjudicative metric matters because a third party would not eagerly buy a 15% stake in a closely held corporation where the 70% majority stockholder had a history of fiduciary wrongdoing, much less a 30% interest in a limited partnership that owned a 90% passive member interest in a closely held LLC dominated by the same person. A buyer would discount the value of those interests heavily to account for their lack of marketability and lack of control, with a buyer imposing a particularly heavy discount given Manheim's history of self-dealing.

A court is not limited to awarding a plaintiff the fair market value of the equity interests the controller took. "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages."[121] The award may include "elements of rescissory damages" if the court "considers them

---

[120] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

[121] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440.

susceptible of proof and a remedy appropriate to all the issues of fairness" presented by the case.[122] An award exceeding the fair value of the plaintiffs' shares may be appropriate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved."[123]

When applying these principles, the court must account for the importance of forcing a faithless fiduciary to disgorge the benefits generated by its misconduct. A breach of fiduciary action is not an action for breach of contract where the plaintiff can only recover its own loss; instead, the fiduciary can be forced to disgorge its gain even when the gain did not come at the beneficiary's expense.[124]

---

[122] *Weinberger*, 457 A.2d at 714.

[123] *Id.*

[124] *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) (holding "[e]ven if the corporation did not suffer actual harm, equity requires disgorgement" when a fiduciary improperly uses a corporate asset—there confidential information); *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity."); *Metro Storage*, 275 A.3d at 860 ("a beneficiary can force a fiduciary to disgorge the benefits that the fiduciary received without a showing of harm to the beneficiary"); *Basho*, 2018 WL 3326693, at *24 ("Although a claim for breach of fiduciary duty has only two formal elements, a plaintiff will not be awarded a meaningful remedy without additional showings that parallel the other elements of a traditional common law tort claim. One is a showing of harm to the beneficiary *or, alternatively, the wrongful taking of a benefit by the fiduciary*." (emphasis added)); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not . . . a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

To that end, "the court can, and has in the past, awarded damages designed to eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship."[125] "Once disloyalty has been established, [Delaware remedial] standards . . . require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct."[126]

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.[127]

Once a breach of fiduciary duty has been shown, stockholders are not limited to a fair price. They can be awarded "a fairer price."[128] It follows that stockholders are also not limited to fair market value.

In this case, Ban is entitled—at a minimum—to a price equal to the fair value of his interests. To limit a controller's ability to extract value from the minority, the law must provide a mechanism to address abuse. The fair value standard addresses this issue by insisting that the controller pay the plaintiff the equivalent in damages of the present value of the benefits that the plaintiff could have received by remaining

---

[125] *Gesoff*, 902 A.2d at 1154.

[126] *Thorpe II*, 676 A.2d at 445 (first citing *Oberly*, 592 A.2d 445, 463 (Del. 1991); then citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 334 (Del. 1993)).

[127] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[128] *Dole*, 2015 WL 5052214, at *45.

58

invested in the enterprise. Those ongoing benefits would not discounted for lack of

marketability or control as the plaintiff received them over time. To apply those

discounts when a controller forcibly acquires the minority's equity would deprive the

minority of the full value of the stream of benefits, substitute the lesser price that the

minority would have to accept in a sell to a third party, and enable the controller to

benefit from the delta.[129]

These policy concerns afflict freeze-out mergers, but Delaware law has

addressed them by giving stockholders the right seek an appraisal in which the court

applies a fair value standard without applying stockholder-level discounts for lack of

control. Some Delaware decisions (including my own) have considered the

implications of a minority discount when evaluating the fair price dimension of the

unitary entire fairness test,[130] but the fair price analysis "is part of the entire fairness

---

[129] *See generally Reis*, 28 A.3d at 461–464 (discussing valuation standard); *see also Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989) (expressing concern after a freeze-out merger that "to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result"). *Cf.* Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1032–43 (2009) (explaining policy rationales for using fair value standard).

[130] *See Sears Hometown*, 309 A.3d at 528 ("A claim for breach of fiduciary duty that challenges the fairness of a squeeze-out transaction must account for the implications of control."); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974 (Del. Ch. Oct. 10, 2016) (dismissing complaint challenging freeze-out transaction at a price less than what a third party had recently offered to pay, noting that the price difference was not so facially large as to suggest a breach of duty), *aff'd*, 164 A.3d 56 (Del. 2017) (ORDER); *Mendel v. Carroll*, 651 A.2d 297, 304–05 (Del. Ch.

standard of review; it is not itself a remedial calculation."[131] Once a breach of duty has been shown, the remedial calculation is different. The remedy can be a damages award equal to the fair value of the shares, but "the measure of any recoverable loss . . . under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings."[132]

In this case, using fair market value as a standard and discounting Ban's stake would reward Manheim for his breaches of the duty of loyalty. The court will award Ban the fair value of his equity.

### 2. The Expert Opinions

To quantify his entitlement to damages, Ban relied on expert testimony from Stephen J. Scherf. Manheim did not respond with a valuation of his own. He engaged James Canessa to act solely as a rebuttal expert and ask questions about Scherf's work.

---

1994) (Allen, C.) (distinguishing between proposed value in a controller squeeze-out and proposed value in a third-party bid and declining to enjoin former so that stockholders could accept latter; holding that "the board's duty was to respect the rights of the Carroll Family," including their right not to sell their shares, "while assuring that if any transaction of the type proposed was to be accomplished, it would be accomplished only on terms that were fair to the public shareholders and represented the best available terms from their point of view").

[131] *Reis*, 28 A.3d at 465.

[132] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993).

Scherf submitted what were effectively two opinions. First, he submitted an initial report containing an initial valuation (respectively, the "Original Report" and "Original Valuation").[133] Canessa responded with his rebuttal report.[134] After additional discovery, Scherf submitted a supplemental report with supplemental valuation (the "Supplemental Report" and "Supplemental Valuation").[135]

### a. The Original Valuation

For the Original Valuation, Scherf valued DVRC using a discounted cash flow ("DCF") methodology, then added non-operating income at the DVRC level. Scherf opined that DVRC fair value was $30,474,735.[136] Scherf opined that the fair value of 31.5% interest was $9,599,541.[137]

In the Original Valuation, Scherf used management's projections for DVRC. This court has expressed a preference for valuations "based on contemporaneously prepared management projections."[138] In the analogous appraisal context, the court

---

[133] JX 193.

[134] JX 194.

[135] JX 231.

[136] JX 193 at 14.

[137] *Id.*

[138] *Doft & Co. v. Travelocity.com*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004).

has been skeptical of litigation-driven adjustments to management projections.[139] But this court has used adjusted projections when the expert has provided sufficient support for the modifications.[140]

Management's projections did not anticipate the creation of any addition EB-5 investment vehicles and thus contemplated that DVRC would not continue as a going concern. By treating DVRC as if it were in winddown, management's projections necessarily undervalued DVRC relative to what its value would have been as a going concern,

Scherf accepted management's revenue projections without adjustment. For expenses, Scherf took into account that projected expenses exceeded historical levels and include amounts the Penfold Litigation found excessive. Scherf therefore drew

---

[139] *E.g.*, *Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely."); *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003) ("Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, post hoc, litigation-driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions.' " (*quoting Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch.2001))), *aff'd in pertinent part, rev'd in part*, 875 A.2d 602 (Del.2005).

[140] *See Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 62 (Del. Ch.2007) (adopting reasonable updates to management projections); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *11 (adjusting management forecasts to exclude revenue from division deemed likely to be sold); *In re U.S. Cellular Operating Co.*, 2005 WL 43994, at *11–15, *19 (Del. Ch. Jan. 6, 2005) (building projections based on expert-created forecasts and finding DCF most reliable evidence of value).

historic expenses from DVRC's audited financial statements and normalized them when projecting future expenses. That was a reasonable approach.

A critical input for a DCF model is the discount rate. Scherf used a capital asset pricing model ("CAPM") to derive a discount rate of 9.4%. "CAPM . . . should be used where it can be deployed responsibly."[141] The only input warranting debate was Scherf's omission of a size premium.

Canessa criticized the Original Valuation; he did not offer a valuation of his own. Canessa correctly noted that the Original Valuation omitted an material agent payment. Canessa then valued that payment as if it were due in 2022, despite management not being able to predict when it would come due. Canessa's approach maximized the reduction in value. Although a lower reduction would have been warranted, the court adopts Canessa's modification, which reduces Ban's share of DVRC's fair value to $8,547,504.[142]

Canessa next criticized the Original Valuation for the normalizing adjustments that Scherf made to DVRC's expenses. The court agrees with and accepts Canessa's criticisms regarding litigation expenses and compensation expenses already included in the projections. The court does not accept Canessa's criticisms of

---

[141] *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *17 (Del. Ch. July 18, 2022), *aff'd sub nom Orchard Enters., Inc. v. Merlin P'rs LP*, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE).

[142] JX 194 at 4, 10.

Scherf's other adjustments.[143] Making the adjustments the court accepts has the effect of reducing Ban's share of DVRC's fair value to $7,452,002.[144]

Canessa next criticized the Original Valuation for incorrectly including an extra month of revenue in 2022 that Scherf should have excluded because of his valuation date. The court agrees with and accepts Canessa's correction, which reduces Ban's share of DVRC's fair value to $7,286,457.[145]

Last, Canessa criticized the Original Valuation for overstating the value of a non-operating asset. The court agrees with and accepts Canessa's correction, which reduces Ban's share of DVRC's fair value to $6,898,612.[146]

### b. The Supplemental Valuation

After additional discovery, Scherf prepared the Supplemental Valuation. That valuation more than doubled DVRC's fair value to $77,777,828, resulting in Ban's

---

[143] Accepting Canessa's other adjustments would reduce Ban's share of fair value by approximately $3.2 million. *Id.* at 19. Scherf provides additional criticisms of the expense projections in the Supplemental Report. *See* JX 232 at 19–24. Although the court does not accept all of Scherf's criticisms, taken as a whole they warrant making normalizing adjustments to the projections along the lines of the Original Valuation. Scherf took a different approach in the Supplemental Report by using a percentage in place of management's estimates. *See id.* at 23–24. The court uses the adjustments in the Original Report, which result in a more conservative valuation.

[144] *Id.* at 14.

[145] *Id.* at 20.

[146] *Id.* at 23.

31.5% share equating to $24,511,386.[147] The Supplemental Valuation was not credible.

In the Supplemental Valuation, Scherf again used a DCF methodology. This time, however, he relied on a new set of projections based on estimates of the length of time that DVRC's approximately 800 remaining foreign investors would stay invested in DVRC. Recall that investors receive their capital back when they file an I-829 application to receive final approval for permanent resident status or when they decide to exit the EB-5 program voluntarily. Sometimes the latter happens because the process takes so long and the investor gets tired of waiting. Sometimes life events intervene. An investor might have died. Or an investor might have sought a visa for a spouse and gotten divorced. Or an investor might have obtained permanent resident status by other means.

To estimate DVRC's investment horizon, Ban engaged Wonjoon Kang, a friend who has worked on EB-5 matters since 2008.[148] Although Manheim argued that Kang lacked the specific expertise necessary to estimate DVRC's investment horizon, the court finds Kang sufficiently qualified to address that subject.

Kang opined on how long it would take for investors who entered the EB-5 program between 2014 and 2019 to obtain permanent resident status. He relied on his own experience and publicly available information, including statements by

[147] *See* JX 200 at 5.

[148] Kang Tr. 21, 57.

65

Charles Oppenheim, a former USCIS official whom Manheim retained as an expert. For example, Kang opined that the average wait times would be approximately 14.4 years for Chinese applicants in 2015 and increase steadily to 25.3 years for applicants in 2019. He attributed these extended wait times to the limited number of visas available annually and a large backlog of applications. The Reform Act exacerbated the situation by reducing the number of visas available to pre-enactment investors by 32%.

There is no dispute that an EB-5 center must redeploy capital so it remains "at risk" until investors receive permanent resident status. Kang opined that DVRC therefore could not wind down its funds and would have to redeploy its investors' capital, resulting in cash flows for DVRC over a longer time period. He further estimated that DVRC could earn returns exceeding 10% upon redeployment.[149]

Scherf might have permissibly relied on this methodology had he used in the Original Report. The record reflects that DVRC will continue to generate revenue beyond management's original projection period, where revenue ended in 2027, if only because RDLP loaned funds to St. James LLC under a loan that will not come due until 2032. Management's projections thus meaningfully undervalued DVRC because they depicted a firm that will stop generating revenue in 2027. But rather than creating a more realistic model for years beyond that point in his Opening Report, Scherf introduced another model in his Supplemental Report.

---

[149] JX 192 at 6–7.

That was improper. An expert cannot come up with completely new inputs in a supplemental expert report.[150] An expert can make adjustments to his opinions to reflect late-breaking discovery, account for the evidence adduced at trial, or respond to criticisms from the other side.[151] Here, Scherf went too far. The court will not consider the aspects of the Supplemental Report that rely on the new projections.

Canessa offered a supplemental rebuttal report in which he took issue with Scherf's new valuation.[152] Canessa also objected for the first time to Scherf's decision not to include a size premium when calculating CAPM. Just as Scherf's new

---

[150] *IQ Holdings, Inc. v. Am. Com. Lines Inc.,* 2012 WL 3877790, at *2 (Del. Ch. Aug. 30, 2012) ("For an expert to create a new analysis or materially change his opinions after the expert discovery cutoff risks trial by surprise and deprives the opposing party of an orderly process in which to confront and respond to the expert's views. Equally important, a new or materially changed analysis imposes burdens on the Court, which must attempt to evaluate the expert's opinions without the full benefits of adversarial testing."); *Candlewood Timber Grp. LLC v. Pan Am. Energy LLC*, 2006 WL 1382246, at *11 (Del. Super. Ct. May 16, 2006) (analyzing whether an expert's affidavit contained "new or supplemental opinions" or information "submitted to assist the Court in evaluating the expert['s] methodologies and resolving any question about the reliability of the underlying analyses . . . not to offer [a] new opinion." (citations omitted)); s*ee Coleman v. PriceWaterhouseCoopers LLC*, 902 A.2d 1102, 1106 (Del.2006) (affirming exclusion of late-produced supplemental expert report).

[151] *IQ Holdings,* 2012 WL 3877790, at *2 (" In contrast to new analyses and material changes, concessions and efforts to eliminate disagreement are helpful and encouraged, and providing an updated report reflecting the concessions or agreements assists the Court in understanding the changes. Because an expert always could concede a point on the witness stand, it should rarely be prejudicial for an expert to provide a revised report before trial showing the implications of a concession.").

[152] JX 231.

projections came too late, so did Canessa's objection to the absence of a size premium.[153] Scherf gave credible reasons for declining to include a size premium. Moreover, having credited Canessa's views on a series of corrections to Scherf's valuation, the court believes that on this debatable issue, the benefit of the doubt should run in favor of Ban and against Manheim.

### 3. The Damages Award

Ban is entitled to an award of damages based on the fair value of his equity interests at the time Manheim eliminated them. Ban's damages include his 15% interest in WestCo and his one-third interest in Penfold, which held a 90% interest in DVRC. In total, Ban held a 31.5% indirect interest in DVRC. The court accepts Scherf's Original Valuation, as corrected by Canessa and further adjusted by the court. Thus, Ban's interest in DVRC has a fair value of $6,898,612.

### III. CONCLUSION

Judgment will be entered holding Manheim liable to Ban in the amount of $6,898,612. Pre-judgment interest on $363,085 will run from May 10, 2022, the date of the WestCo Call, through the date of judgment. Pre-judgment interest on $6,535,527 will run from August 2, 2022, the date of the DVRC Redemption, through

---

[153] *See IQ Holdings*, 2012 WL 3877790, at *3 ("The discount rate was an input that Fuller necessarily considered and formed a view about when preparing his original report. He then changed his view after the expert discovery cutoff to adopt a materially different figure. … IQ Holdings has not meaningfully suggested why Fuller had good cause to make the change…. Fuller therefore will not be permitted to rely on the weighted average cost of capital to discount the company's debt; he must stand on his earlier and lower figure.").

the date of judgment. Post-judgment interest will run from the entry of judgment until the date of payment. Interest will accrue at the legal rate, compounded quarterly, with the interest rate changing with changes in the reference rate. These amounts must be offset by any distribution Ban previously received.

Within thirty days, the parties will submit a form of judgment that has been agreed-upon as to form. If there are issues that need to be addressed before a final judgment can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. That instruction enlists the parties' assistance in ensuring that no issues have been overlooked. It is not an invitation to raise new issues or seek a do-over.